IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

_____

|                              |   |                              |
|------------------------------|---|------------------------------|
| RANDOLPH SCOTT,              | ) |                              |
| *Plaintiff,*                | ) |                              |
|                              | ) |                              |
| v.                           | ) | Civil Case No. JFM-09-3110   |
|                              | ) |                              |
| NUVELL FINANCIAL SERVICES LLC, | ) |                            |
| et al.,                      | ) |                              |
| *Defendants.*               | ) |                              |

_____

|                              |   |                              |
|------------------------------|---|------------------------------|
| GLADYS GARDNER,             | ) |                              |
| *Plaintiff,*                | ) |                              |
|                              | ) |                              |
| v.                           | ) | Civil Case No. JFM-10-1094   |
|                              | ) |                              |
| GMAC, INC.                   | ) |                              |
| *Defendant.*                | ) |                              |

_____

MEMORANDUM

Plaintiffs Randolph Scott and Gladys Gardner ("Plaintiffs") bring these related actions

individually and on behalf of a putative class of similarly situated individuals against Nuvell

Financial Services LLC, Nuvell National Auto Finance LLC, and GMAC, Inc. (collectively,

"Defendants"). Plaintiffs' complaints, which are substantially similar in all material aspects,

each allege five counts of statutory and contractual claims, all of which arise from Defendants'

alleged misrepresentation that repossessed vehicles would be sold at "public sales." Because I

find that the repossessed vehicles were, in fact, sold at public sales, I will enter summary

judgment in favor of Defendants on all counts.

FACTUAL AND PROCEDURAL BACKGROUND

The following facts are uncontroverted or set forth in the light most favorable to the

plaintiffs. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587-88 (1986).

Defendant GMAC is a Delaware financial services corporation headquartered in Detroit. (Gardner Compl. ¶ 9.)  Nuvell Financial and Nuvell National are both wholly-owned subsidiaries of GMAC.  (Scott Am. Compl. ¶¶ 8-9.)  Defendants provide secured automobile financing for prospective car buyers.  If a borrower subsequently defaults on a car loan, GMAC is entitled to exercise its contractual right to repossess and sell the borrower's vehicle, with the sale proceeds being applied toward the borrower's remaining balance.  Many of GMAC's sales are accomplished through automobile auctions, such as the one run by Manheim Baltimore-Washington ("Manheim") in this case.  Although Manheim's auctions are generally "closed" or "licensed dealer only" auctions, it also conducts sales every other Tuesday which it describes as "public."  These so-called "Tuesday Auctions" are open to the public, but any person who is not a licensed automobile dealer must provide a refundable $1,000 cash deposit in order to attend the auction.[1]  The Tuesday Auctions are advertised in the *Baltimore Sun*—specifically, in the Sunday Classified section relating to the promotion of public auctions.  Aside from providing the time and place of the sale, the advertisements also specify certain conditions of the sale, including the $1,000 refundable deposit requirement for members of the public.  (*See* Defs.' Exs. 1 and 2.)

In November 2007, Plaintiff Scott purchased a Mitsubishi Galant through a retail installment sales contract.  (Scott Am. Compl. ¶ 42.)  Scott's contract was assigned to Nuvell National and serviced by Nuvell Financial.  (*Id.* ¶ 15.)  Scott subsequently defaulted on his loan, and on February 22, 2009, Nuvell Financial repossessed his vehicle.  (*Id.* ¶ 16.)  On March 17, 2009, Nuvell Financial notified Scott that the vehicle would be sold on March 31, 2009 as part of

---

[1] If the attendee purchases a vehicle at the auction, this cash deposit is credited toward the purchase price.  If the attendee does not purchase a vehicle, the deposit is returned in the form of a check two days later.  (Gardner Compl. ¶ 19.)

a public sale at Manheim's so-called "Tuesday auction." (*Id.* ¶ 17.) On April 7, 2009, Nuvell Financial sent Scott a form notice indicating that his car had been sold, detailing the application of the proceeds, and reporting that a deficiency balance of approximately $16,541 remained. (*Id.* ¶ 26.)

In July 2006, Plaintiff Gardner purchased a Chevrolet Impala through a retail installment sales contract. (Gardner Compl. ¶ 12.) The sales contract and a security interest in Gardner's vehicle were assigned to GMAC. (*Id.* ¶ 15.) When Gardner subsequently failed to make scheduled payments on the vehicle, GMAC exercised its contractual right and repossessed the vehicle. (*Id.* ¶ 16.) On December 8, 2009, GMAC sent a notice to Gardner stating that the vehicle would be sold at a "public sale" on Tuesday, January 5, 2010 as part of an auction conducted by Manheim. (*Id.* ¶ 17.) The notice further advised Gardner that "you can attend the sale and bring bidders if you want." (*Id.*) The notice did not mention, however, that members of the public would need to provide a refundable $1,000 cash deposit in order to attend the auction. When Gardner attempted to attend the auction, she was denied admission because she could not provide a $1,000 deposit. (*Id.* ¶ 26.) After Gardner's vehicle was sold at the auction, GMAC notified Gardner of the sale, detailed the application of the proceeds from the sale, and informed her of the balance remaining due. Specifically, GMAC reported that Gardner's vehicle had sold for $7,700 and that a deficiency balance of approximately $12,196 remained. (*Id.* ¶ 28.)

On September 22, 2009, Scott filed a lawsuit against Nuvell National and Nuvell Financial in the Circuit Court for Baltimore County. This suit was removed to federal court on November 20, 2009, and Scott filed an amended complaint on December 22, 2009.[2] Meanwhile,

---

[2] The *Scott* matter was initially assigned to my colleague on the District of Maryland, the Honorable William D. Quarles. However, due to the substantial similarities between the *Scott* and *Gardner* actions, the *Scott* case was reassigned to me on November 30, 2010.

Gardner filed suit against GMAC on April 30, 2010. Scott and Gardner's suits are nearly identical in all material respects. In addition to involving similar facts, both suits are styled as putative class actions on behalf of Plaintiffs and all others similarly situated, and both allege the same five counts: violation of Maryland's Credit Grantor Closed End Credit Provisions, Md. Code Ann., Com. Law §§ 12-1001 *et seq.* ("CLEC") (Count I); breach of contract (Count II); declaratory and injunctive relief (Count III); restitution and unjust enrichment (Count IV); and violation of the Maryland Consumer Protection Act, Md. Code Ann., Com. Law §§ 13-101 *et seq.* ("CPA") (Count V). Significantly, both suits are also predicated on the factual premise that the Tuesday Auctions were private sales subject to more stringent notice and accounting requirements.

After discovery had begun on the class certification issue, I raised *sua sponte* the question of whether the Tuesday Auctions were public sales, and I invited Defendants in both cases to file motion for judgment on the pleadings so that, if Defendants' arguments proved meritorious, the cost of discovery, class action briefing, and summary judgment briefing might be avoided.[3] Defendants did file a dispositive motion, albeit a motion for summary judgment pursuant to Rule 56, and explained that a Rule 56 motion was appropriate because resolving the legal issue of whether the auctions were public or private "requires the Court to examine publicly available evidence outside the pleadings—advertisements contained . . . in the *Baltimore Sun*—to

---

[3] I note that Judge Quarles previously had denied a motion to dismiss filed by the Nuvell Defendants in the *Scott* case prior to that matter being transferred to me. Although I ultimately disagree with Judge Quarles about the viability of Plaintiffs' claims, I very much respect his thoughtful approach to the question. Indeed, in my February 14 letter to counsel, I indicated that I may have reached the same conclusion had I been asked to rule on the Nuvell Defendants' initial motion. It was only after I had considered the memoranda filed in connection with a discovery dispute between the parties that I began to question whether the claims asserted by Plaintiffs were sufficient to withstand a dispositive motion.

determine whether and how the auctions in question were advertised." (Correspondence from Defs., Doc. 55 at 1-2.) Defendants' motions will be granted.

ANALYSIS

I.    Standard of Review

Defendants' Motion for Summary Judgment is properly titled, as the newspaper classified advertisements attached to their motion could not be considered in a motion for judgment on the pleadings under Rule 12(c).[4]  A motion for summary judgment should be granted only if there is no genuine dispute as to a material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a).  A material fact is one that "might affect the outcome of the suit." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A genuine dispute about a material fact exists only "if the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Id.*  Although a district court should "draw all justifiable inferences in favor of the nonmoving party," *Masson v. New Yorker Magazine*, 501 U.S. 496, 520 (1991), "[t]he party opposing a properly supported motion for summary judgment may not rest upon the mere allegations or denials of its pleadings, but rather must set forth specific facts showing that there

---

[4] It is true that when considering a Rule 12 motion, a district court may weigh evidence outside of the pleadings so long as it is "integral to the complaint and authentic." *Phillips v. Pitt Cnty. Mem. Hosp.*, 572 F.3d 176, 180 (4th Cir. 2009).  A document is "integral" to the complaint if "its very existence, and not the mere information it contains, gives rise to the legal rights asserted." *Walker v. S.W.I.F.T. SCRL*, 517 F. Supp. 2d 801, 806 (E.D. Va. 2007).  Examples of documents that have been deemed integral to a complaint include "the allegedly fraudulent document in a fraud action, the allegedly libelous magazine article in a libel action, and the documents that constitute the core of the parties' contractual relationship in a breach of contract dispute." *Fisher v. Md. Dep't of Pub. Safety & Corr. Servs.*, Civil No. JFM-10-206, 2010 U.S. Dist. LEXIS 68772 (D. Md. July 8, 2010) (internal quotation and citations omitted).  Although the advertisements in question here are central to the arguments raised in Defendants' dispositive motion, they do not give rise to the legal rights asserted in this case.  Accordingly, they are not documents "integral to the complaint" that may be considered as part of a Rule 12 dispositive motion.

is a genuine issue for trial," *Bouchat v. Balt. Ravens Football Club, Inc.*, 346 F.3d 514, 525 (4th Cir. 2003).

II.     Plaintiffs' Request for Discovery

Plaintiffs contend that a summary judgment motion is premature at this stage of the litigation because the parties have yet to complete discovery. Rule 56(d), formerly Rule 56(f), states that "[i]f a nonmovant shows by affidavit or declaration that, for specified reasons, it cannot present facts essential to justify its opposition, the court may . . . defer considering the motion or deny it." Fed. R. Civ. P. 56(d). Thus, as a general rule, "summary judgment may be refused where the nonmoving party has not had the opportunity to discover information that is essential to his opposition." *Nguyen v. CNA Corp.*, 44 F.3d 234, 242 (4th Cir. 1995) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 n.5 (1986)). Nonetheless, "Rule 56(d) affidavits cannot simply demand discovery for the sake of discovery." *Young v. UPS*, Civil No. DKC-08-2586, 2011 U.S. Dist. LEXIS 14266 (D. Md. Feb. 14, 2011). Rather, to justify a denial of summary judgment on the grounds that additional discovery is necessary, the facts identified in a Rule 56 affidavit must be "essential to [the] opposition." *Id.* Accordingly, a nonmoving party's request to permit further discovery is properly denied "where the additional evidence sought for discovery would not have by itself created a genuine issue of material fact sufficient to defeat summary judgment." *Strag v. Bd. of Trs., Craven Cmty. Coll.*, 55 F.3d 943, 953 (4th Cir. 1995); *see also Young*, 2011 U.S. Dist. LEXIS 14266 (holding that plaintiff's Rule 56(d) request for further discovery "must be denied, as the additional requested discovery would not create a genuine dispute of fact sufficient to defeat summary judgment"); *Amirmokri v. Abraham*, 437 F. Supp. 2d 414, 420 (D. Md. 2006) ("A Rule 56[(d)] motion for additional

discovery is properly denied when the additional evidence sought to be discovered would not create a genuine issue of material fact sufficient to defeat summary judgment.").

In addition to responding to the substance of Defendants' Motion for Summary Judgment, Plaintiffs in this case also attach a Rule 56(d) affidavit to their opposition briefing asserting the need for additional discovery prior to any entry of summary judgment. (Pls.' Ex. 3, Carney Aff.) The affidavit states that Plaintiffs need further discovery with respect to a number of issues, including, *inter alia*, the reasons for the size and layout of the newspaper advertisement, the reasons for the refundable deposit required to attend Tuesday Auctions, the number of people attending and turned away from Tuesday Auctions, and the number of vehicles sold at Tuesday Auctions. (Pls.' Ex. 3, Carney Aff., at 2-4.) Additionally, the affidavit asserts that Plaintiffs need to depose Mark Wanamaker, the General Manager at Manheim Baltimore-Washington, and "the corporate designees of the Defendants and Manheim auction." (Pls.' Ex. 3, Carney Aff., at 3.)

Although Plaintiffs claim a need for additional discovery on a range of issues, they have "failed to demonstrate that the evidence [they] seek[] to recover will materially affect the outcome of the case." *Amirmokri*, 437 F. Supp. 2d at 420. Defendants' principal argument in support of their motion for summary judgment—which, for reasons set forth below, I find persuasive—is that the Tuesday Auctions were public sales and that the notices provided to Plaintiffs therefore satisfied the requirements of CLEC. Indeed, Plaintiffs themselves do not dispute that this issue is dispositive and that they cannot prevail on their claims if the Tuesday Auctions are deemed to have been public sales. Yet an examination of Defendants' motives in adopting certain advertising and eligibility policies does not bear on this question of whether the sales were public. Nor does an inquiry into the number of attendees at the Tuesday Auctions, the

number of vehicles sold at the auction, or any other factual issue raised in the affidavit. As explained below, whether the Tuesday Auctions were public sales depends on whether they were adequately publicized and open to the public for competitive bidding. Because none of the factual disputes flagged in Plaintiffs' Rule 56 affidavit would materially affect the outcome of this inquiry, it would be unwarranted to delay ruling on Defendants' Motion for Summary Judgment so that additional discovery could take place.

III.  <u>CLEC Claim</u>

The central allegation in both the *Scott* and *Gardner* actions is that Defendants failed to comply with CLEC's notice and accounting requirements applicable to private sales and are therefore barred from collecting any alleged deficiency balance. Under Maryland's CLEC provisions, repossessed vehicles may be sold at either private sales or public auctions. Md. Com. Law § 12-1021(j). CLEC provides that a credit grantor must notify the defaulting borrower of the time and place of the sale and make certain post-sale financial disclosures to the borrower. *Id.* In the case of a public sale, CLEC requires this post-sale disclosure to consist only of a written statement to the borrower detailing how the sale proceeds were distributed. Md. Com. Law § 12-1021(k)(3). A private sale, however, implicates a number of additional disclosure requirements, including the purchaser's name and address, the number of bids sought and received, and any information about the vehicle's condition at the time of repossession that would cause its value to differ from the market value for goods of like kind and quality. Md. Com. Law § 12-1021(j)(2). If a credit grantor fails to comply with these notice and disclosure requirements, it "shall not be entitled to any deficiency judgment to which he would be entitled under the loan agreement." Md. Com. Law § 12-1021(k)(4).

The critical question raised by Defendants' motion, then, is whether the Tuesday Auctions were public or private sales. CLEC does not define the term "public auction," and the Maryland Court of Appeals has likewise never expressly construed the term.[5] Maryland courts have quoted with approval the National Auctioneers Association's definition of "public auction," however, which describes a public auction as a sale "in a public forum through open and competitive bidding." *See, e.g.*, *Pyles v. Goller*, 674 A.2d 35, 37 (Md. Ct. Spec. App. 1996). Although not controlling on a question of state law, the Fourth Circuit has adopted a similar definition, stating that a public sale is "one to which the public is invited by advertisement to appear and bid at auction for the goods to be sold." *In re Bishop*, 482 F.2d 381, 385 (4th Cir. 1973) (quoting Restatement (First) of Security § 48, cmt. c (1941)). The Fourth Circuit also has favorably quoted Gilmore's treatise on Security Interests in Personal Property: "Presumably the essence of a public sale is that the relevant public is not only invited to attend but is also informed, by whatever means of publicity may be appropriate, when and where the sale is to be held." *Id.* (quoting 2 G. Gilmore, Security Interests in Personal Property 1242 (1965)). The consensus that emerges from these definitions seems to be that a public sale involves two key elements: (1) public advertisement and notice; and (2) a forum open to the public for competitive bidding. As set forth below, the Tuesday Auctions meet each of these requirements.

A.    Advertisement

It is undisputed that the Tuesday Auctions, including the ones at which Plaintiffs' vehicles were sold, were advertised every Sunday in the *Baltimore Sun*'s classified section

---

[5] The contract was formed in Maryland, a *lex loci contractus* state. Accordingly, because federal jurisdiction is based on the diversity of the parties under 28 U.S.C. § 1332(d), I must apply Maryland substantive law in resolving this dispute. *CTI/DC, Inc. v. Selective Ins. Co. of Am.*, 392 F.3d 114, 118 (4th Cir. 2004).

devoted to the promotion of public auctions.[6]  Microfilm copies of these newspaper

advertisements are attached to Defendants' Motion for Summary Judgment, (Defs.' Exs. 1 & 2),

and a full-sized color reprint of the advertisement is attached to Defendants' reply brief, (Defs.'

Ex. A).  In addition to listing the time and location of the sale and a contact telephone number,

the advertisements also provided the terms and conditions of the auction.  Notably, the

advertisement expressly disclosed the requirement that members of the public present a

refundable $1,000 cash deposit to attend the sale.  (*See, e.g.*, Defs.' Ex. 1 ["$1,000 cash only

deposit required per person with state identification."].)

Plaintiffs do not—and indeed, cannot—dispute that the Tuesday Auctions were publicly

advertised in the manner described above.  Instead, they fall back on the argument that the

Tuesday Auctions were not publicized "in any meaningful way" because of purported

deficiencies in the size and content of the newspaper advertisements.  (Pls.' Opp'n at 28.)  First,

Plaintiffs contend that the text of the advertisements was "so tiny and hard to read that it is

simply not meaningful."  (*Id.* at 29.)  This argument fails for several reasons.  First, it should be

noted that although the font of the advertisement is rather small, it is roughly consistent with the

font sizes used in other auction advertisements on the same page.  (*See* Defs.' Ex. A.)  And while

the copies of the advertisements initially provided by Defendants were somewhat blurry because

they were taken from microfilm, the full-sized reprint attached of the advertisement attached to

Defendants' reply briefing is clear and easy to read.  Additionally, Plaintiffs have not identified a

single case in which an auction was deemed to be private because of the size of the font used in

---

[6] In their memorandum in support of their motion, Defendants assert that the Tuesday
Auctions are also advertised on Manheim's website.  (Defs.' Mem. at 5.)  Plaintiffs' dispute
when these Internet advertisements first appeared, however, and so Defendants agreed in their
reply briefing not to rely on any Internet advertisements at this time so as to avoid any factual
disputes.  (Defs.' Reply at 9 n.5.)

an advertisement.  Consequently, Plaintiffs' argument based on the size of the advertising notices is unavailing.

Plaintiffs also contend that the advertisements were deficient because they made "no mention of the makes or model years of cars, let alone any specific description of their condition."  (Pls.' Opp'n at 30.)  This is problematic, according to Plaintiffs, because they claim that CLEC's provisions contain an implied mandate that any advertisement of a public auction include a description of the property to be sold.  (*Id.* at 30-33.)  The key word in the Plaintiffs' argument is "implied," as this purported requirement does not appear anywhere in the plain language of the statute.  Rather, Plaintiffs claim to have derived it from snippets of language used in several cases, yet none of the cases cited by Plaintiffs even involve CLEC.  Instead, the cases cited by Plaintiffs all deal with the judicial sale of specific tracts of real property, not the disposition of personal property by a credit grantor.  *See Kres v. Hornstein*, 155 A. 171 (Md. Ct. App. 1931); *Pizza v. Walter*, 694 A.2d 93 (Md. Ct. App. 1997).  Because these cases are easily distinguishable on both factual and legal grounds, Plaintiffs' reliance on them in this case is unfounded.[7]

B.     Open to the Public

In addition to being publicly advertised, it is undisputed that the Tuesday Sales could be attended by any member of the public who: (1) was at least 18 years of age; (2) possessed a valid state identification; and (3) paid the refundable $1,000 deposit.  Defendants maintain that these attendance requirements—particularly the refundable deposit—help to preserve the integrity of the auction process because they limit the chances that an auction winner will not have the

---

[7] Moreover, given the limited space available in a typical newspaper classified advertisement, it is unrealistic to expect Defendants to list specific details about every individual car sold at the Tuesday Auctions, and Plaintiffs provide no authority that would require such a step.

financial resources to honor his bid. Moreover, the record further establishes that the above requirements were expressly disclosed in the newspaper advertisements for the Tuesday Auctions. (*See* Defs.' Exs. 1 & 2.) On the basis of these facts alone, there seems to be little question that the Tuesday Auctions were open to the public.

Nonetheless, Plaintiffs contend that these auctions still cannot be considered public sales because "the $1,000 cash entrance fee means that the Tuesday Sales were not open to the general public." (Pls.' Opp'n at 40.) Indeed, Plaintiffs emphasize that Gardner herself was turned away from the sale at which her vehicle was auctioned because she could not provide the required deposit. (Gardner Compl. ¶ 26.) According to Plaintiffs, Defendants' explanation that the deposit requirement is designed to ensure that auction participants are bona fide purchasers constitutes "an explicit admission that the deposit is a barrier to public attendance" and the sale is therefore private. (Pls.' Opp'n at 40.)

Plaintiffs are incorrect. As initially enacted, CLEC only permitted credit grantors to dispose of repossessed goods through public sales. In 1987, however, CLEC was amended to allow the sale of repossessed sales at private sales as well. The private sale option was adopted after the legislature determined that, at that time, "many public sales (auctions) cannot be attended by private buyers due to limitations on how the purchase price must be paid, eligibility to bid, and other restrictive [sic] factors." (Defs.' Ex. B., Legislative History of S.B. 839, 1987 Leg. Sess. (Md. 1987.)) This statement shows that in Maryland, public auctions have long been understood to involve restrictions and limitations on sales. Indeed, restrictions on public auctions apparently were so common that the Maryland legislature was compelled to enact statutory amendments to address them. This understanding of public sales is further confirmed by Maryland case law. In *Pyles v. Goller*, for example, a newspaper advertisement for the sale

of real property declared that "a cashier's check or certified check in the amount of $5,000 will be required in order to bid for each lot you intend to buy." 674 A.2d at 37. That the auction in *Pyles* was considered to be a public sale in spite of this requirement is entirely consistent with the understanding of "public sale (auction)" evinced by the legislative history of CLEC. Against this backdrop, the mere fact that Defendants required a refundable deposit to attend the Tuesday Auctions does not convert the otherwise public sale into a private one.

The preceding discussion shows that the Tuesday Auctions at issue in this case were public sales that were both widely advertised and open to the public for competitive bidding. Accordingly, CLEC's disclosure requirements for private sales, upon which Plaintiffs' claims are based, were never triggered and are inapplicable to this action. Consequently, Defendants need only to have complied with the less stringent disclosure requirements for public sales found at § 12-1021(j)(1) and § 12-1021(k)(3), requiring notice of the time and place of the sale and a post-sale statement showing the distribution of the proceeds. As it is undisputed that Defendants met these requirements, I will grant summary judgment to Defendants on the asserted CLEC claims.

IV.     Remaining Claims

The remaining counts in Plaintiffs' complaints are all predicated on the alleged violation of CLEC. Count II, for breach of a contract, asserts that "[w]hen [Defendants] violated CLEC . . . it materially breached its contracts with [Plaintiffs] and the members of the Class." (Scott Am. Compl. ¶ 54; Gardner Compl. ¶ 57.) Count III seeks a declaratory judgment that Defendants violated CLEC and an injunction against continued alleged violations. (Scott Am. Compl. ¶¶ 57-67; Gardner Compl. ¶¶ 60-70.) Count IV asserts seeks restitution for Defendants' alleged unjust enrichment in retaining "illegally collected charges." (Scott Am. Compl. ¶¶ 68-

72; Gardner Compl. ¶¶ 71-75.)  Count V alleges a violation of Maryland's Consumer Protection

Act for alleged deceptive trade practices—namely, stating that the auction would be public when

Plaintiffs believed it to be a private sale.  (Scott Am. Compl. ¶¶ 73-82; Gardner Compl. ¶¶ 76-

85.)  Because Plaintiffs cannot prevail on their CLEC claim for the reasons discussed above,

these remaining claims necessarily fail as well.  Accordingly, I will grant summary judgment to

Defendants on Counts II, III, IV, and V.

 For the foregoing reasons, Defendants' motion for summary judgment will be granted.  A

separate order implementing this decision is being entered herewith.


Date:  June 7, 2011     _____/s/_____
         J. Frederick Motz
         United States District Judge